[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-13404

_____

D.C. Docket No. 5:11-cv-00284-CAR

JANE MCGINNIS,

>Plaintiff-Appellant
>Cross Appellee,

versus

AMERICAN HOME MORTGAGE SERVICING, INC.,

>Defendant-Appellee
>Cross Appellant.

_____

Appeals from the United States District Court
for the Middle District of Georgia

_____

(March 22, 2016)

Before JORDAN and JULIE CARNES, Circuit Judges, and ROBRENO,[*] District
Judge.

_____

[*] Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of
Pennsylvania, sitting by designation.

ROBRENO, District Judge:

Plaintiff-Appellant/Cross Appellee Jane McGinnis ("McGinnis"), a landlord of rental properties, brought suit against Defendant-Appellee/Cross Appellant American Home Mortgage Servicing, Inc. ("Homeward"),[1] the servicer of the loans on seven of her residential properties, alleging that Homeward violated terms of the deed and promissory note governing the loans. At the end of a bifurcated trial, the jury found in McGinnis's favor on all claims and awarded her $6,000 in compensatory damages, $500,000 in emotional distress damages, and $3,000,000 in punitive damages.

Following the verdict, however, the district court granted Homeward's renewed motion for judgment as a matter of law ("JMOL") on the issue of punitive damages and reduced the jury's punitive damages award to $250,000 based on a cap imposed by a Georgia statute. Both parties now appeal on several grounds.

After careful review, and having had the benefit of oral argument, we will affirm all of the district court's rulings except its grant of Homeward's renewed JMOL motion on the issue of reducing the amount of punitive damages.  We hold that Homeward failed to preserve this argument in its initial JMOL motion, and thus remand to the district court for consideration of whether Homeward is entitled to a new trial on the issue of punitive damages.

---

[1]     American Home Mortgage Servicing, Inc. is now "Homeward Residential, Inc."

2

## I.    FACTUAL BACKGROUND

McGinnis owns a number of residential rental properties, and she has entrusted her son Adam with managing the properties and their financial affairs.[2] On October 31, 2006, McGinnis refinanced seven of her rental properties with Taylor, Bean & Whitaker ("TB&W"). She granted security deeds and promissory notes to TB&W, and each loan was subject to a family rider providing that a default on any one of the loans triggers a default on all of the others.

According to the deed, the lender may "collect and hold Funds in an amount . . . not to exceed the maximum amount a lender can require under [the Real Estate Settlement Procedures Act ("RESPA")]." The "Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law." "If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments."[3]

---

[2]    Although many of the communications occurred between Homeward and Adam—who had at least some background in real estate property management and finances—for simplicity's sake, we will refer to Adam's actions as those done by McGinnis.

[3]    Although RESPA does not apply to investment loans like those at issue in this case, under the terms of the security deeds, the lender voluntarily agreed to calculate and collect escrow payments according to RESPA's requirements. See Deed, Doc. 89-2 at 5.

3

Once TB&W originated McGinnis's loans, it packaged and sold them as part of a mortgage-backed security. On October 17, 2009, Homeward obtained the rights to service McGinnis's seven loans, upon which it sent McGinnis a welcome letter for each of McGinnis's seven loans.

Although McGinnis's monthly payments to TB&W had been $605.58 until that point, the welcome letter included a payment coupon stating—with no explanation—that McGinnis's November 2009 payment had risen to $843.58. The same thing happened with McGinnis's other loans. Believing that she did not in fact owe $843.58, McGinnis disputed and refused to pay the increased amount. Instead, she submitted a check to Homeward for $605.58 to cover her November 2009 payment for the loan for 172 Hilton Street, and made similar payments for the other loans.

In December 2009, after McGinnis again submitted payments on all of her loans in the amounts she had previously been paying, Homeward conducted an escrow analysis for 172 Hilton Street and mailed this escrow disclosure statement to McGinnis on December 17, 2009. The statement describes McGinnis's "present payment" as $843.58, consisting of $490.13 for principal and interest and $353.45 for escrow deposit. Thus, McGinnis's escrow deposit payment—which had previously been $115.45—had inexplicably increased by roughly 200% to $353.45. The statement also describes her "new payment effective 02/01/2010" as

4

$680.08, consisting of $490.13 for principal and interest, $138.46 for escrow deposit, and $51.49 for escrow shortage.

In response to the escrow statement, McGinnis sent Homeward a fax, which asserted that she had made all of her payments to TB&W and Homeward, she had not been receiving billing statements, she should not be charged any late fees, and the escrow amounts were too high.

On January 15, 2010, Homeward sent McGinnis a letter explaining that the recent "escrow analysis on [her] loan . . . could have erroneously reflected either an escrow overage or shortage due to missing information." The letter instructed McGinnis to disregard the December 17 escrow analysis and to continue making payments at the present monthly payment amount. However, on February 20, 2010, Homeward sent a second escrow analysis statement that described McGinnis's present payment as $843.59 (somehow the payment had been increased by one cent)[4] through March 2010, and described McGinnis's new payment effective April 1, 2010 as $638.32—consisting of $490.13 for principal and interest, $140.55 for escrow deposit, and $7.64 for escrow shortage.

Pursuant to the terms of the Security Deed, Homeward placed the $605.58 payments (which it deemed to be partial) into a suspense account until enough funds accrued to pay off the oldest past-due monthly payment. Any remaining

---

[4]     The escrow deposit amount was increased by one cent to $353.46 in this statement; unless otherwise noted, we will use the $353.45 figure for simplicity's sake.

5

funds were held in the suspense account until enough funds accumulated to cover the next past due payment, and the process repeated itself for the entire time that Homeward serviced McGinnis's loans. As these patterns persisted, the interest, collection calls, and late fees continued to mount alongside the increasing amounts McGinnis owed on her monthly escrow payments. Moreover, over the course of 2010, Homeward also began assessing fees for collection letters, inspections, and other expenses relating to the default that Homeward caused.

On May 19, 2010, McGinnis sent Homeward another fax explaining that McGinnis's correct payment for November 2009 through March 2010 should be $605.58, and providing Homeward with Adam's own escrow analysis and offering to pay that amount:

> The new total tax and insurance is 1686.59 for the year divided by 12 equals 140.55/month plus the 490.13 is ($630.68). I have tried to explain this over and over again showing you that in February the 24th via fax and conversation with someone that I though[t] understood was helping resolve this and still nothing. I know I owe you little more for the shortage in the escrow (tax and insurance) only but I have not at any time had a payment of $843.59 . . . . I want to pay this loan off ASAP. I will not pay any late fees or any differences in monthly payments. . . . I need for AHMSI to come up with a payoff as of June 1st 2010[.]

Adam's analysis was essentially identical to Homeward's February 19, 2010, escrow analysis as to the correct amount for McGinnis's payments from April 2010 onward. The only difference is that McGinnis refused to pay the $843.58

6

amount that Homeward insisted was owed for November 2009 through March 2009 and any late fees or other fees associated with those payments.

On June 30, 2010, Homeward sent a letter in response that offered justifications for the assessment of the late fees and explained that the total amount due on the loan was $1,491.36, but failed to provide any explanation or retraction of the $843.48 amount.

The same issues persisted through the rest of 2010, and McGinnis continued to pay only $605.58 until January 2011, when she began paying the $638.32 amount that first appeared in the February 2010 escrow analysis statement.

Homeward began returning or rejecting McGinnis's payments from February 2011 through May 2011, and on March 22, 2011, Homeward's attorneys sent a formal notice of foreclosure for 172 Hilton Street. For several weeks starting in April 2011, Homeward ran foreclosure advertisements in the local newspaper. Finally, on July 7, 2011, Homeward foreclosed on 172 Hilton Street.

Following the foreclosure of 172 Hilton Street, Homeward continued the same pattern—holding payments in suspense accounts, assessing late fees, returning checks, and threatening foreclosure—with respect to the remaining properties.

At trial, McGinnis's clinical psychologist, Dr. Andrew Sappington, opined that the circumstances leading up to this foreclosure have been a "major cause

7

of . . . depression" for McGinnis. The severity of her emotional distress has caused her to suffer major physical symptoms, including "projectile vomiting," and she views the situation as "as life or death." McGinnis, a retiree, described the effect of the dispute with Homeward in her own words: "I am too old to start over. They have taken my life away from me."

## II.    PROCEDURAL HISTORY

McGinnis filed suit against Homeward in the United States District Court for the Middle District of Georgia. After some initial proceedings and discovery, McGinnis filed an amended complaint, asserting a number of claims, including: (1) wrongful foreclosure; (2) violation of RESPA; (3) intentional infliction of emotional distress ("IIED"); (4) conversion; (5) tortious interference with property rights; (6) defamation; and (7) the violation of Georgia's Racketeer Influenced and Corrupt Organizations ("RICO") Act. McGinnis also sought attorney fees and punitive damages.

Upon completion of discovery, Homeward filed a motion for summary judgment. The district court granted summary judgment for Homeward on McGinnis's claims for violation of RESPA, defamation, violation of Georgia's RICO Act, and any wrongful foreclosure claim based on Homeward's failure to respond to her communications, and denied summary judgment on the remainder of McGinnis's claims.

After the district court's disposition of the motion for summary judgment, Homeward moved to bifurcate the trial into two phases—one for liability and another for punitive damages and attorney fees. The district court granted this motion. Homeward also moved to exclude various types of evidence, including the testimony of its own 30(b)(6) witness, Christopher Delbene.[5] The district court denied the motion to exclude Delbene's escrow analysis testimony.

The case then proceeded to the first phase of trial. After the end of McGinnis's case, the district court held a charge conference, during which it heard objections to the proposed jury instructions. At the charge conference, Homeward moved, under Rule 50(a), for judgment as a matter of law on McGinnis's claims for conversion, wrongful foreclosure, interference with property rights, and IIED. The district court denied Homeward's Rule 50(a) motion.

Thereafter, the trial resumed and Homeward put on its case, which consisted of one witness—Christopher Delbene, who testified by video deposition. After the end of Homeward's case, the district court submitted only the issue of liability to the jury. By special verdict, the jury found in McGinnis's favor on each of her claims—conversion, wrongful foreclosure, interference with property rights, and IIED. The jury awarded McGinnis $6,000 in compensatory damages and $500,000

---

[5]    Homeward moved to exclude Delbene's testimony on the grounds that the topic of escrow analysis was not included in Plaintiff's 30(b)(6) deposition notice to Homeward.

in emotional distress damages. The jury further found that McGinnis could recover attorney fees and punitive damages.

The trial then proceeded to the second phase, during which neither party offered additional evidence and McGinnis waived her claim for attorneys' fees. The jury again found in McGinnis's favor, finding that "the Defendant acted with specific intent to cause the Plaintiff harm" and awarding McGinnis $3,000,000 in punitive damages. Jury Verdict, Doc. 96 at 1.

Following the district court's entry of judgment consistent with the jury's verdict, Homeward moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and for a new trial under Federal Rule of Civil Procedure 59. The district court granted in part Homeward's Rule 50(b) motion, holding that there was insufficient evidence to show that Homeward acted with specific intent to cause harm and reducing the jury's award of punitive damages to $250,000. The district court denied the remainders of Homeward's motion for judgment as a matter of law and motion for a new trial[6] and entered an amended judgment. Following the entry of the amended judgment, McGinnis filed a notice of appeal, and Homeward cross-appealed.

---

[6]    The district court stated that it denied the entirety of Homeward's motion for a new trial, but because of its ruling on Homeward's Rule 50(b) motion, the district court in fact declined to rule on the portions of the Rule 59 motion relating to punitive damages.

10

## III.    DISCUSSION

On appeal, McGinnis brings one challenge to the district court's summary judgment ruling, asserting that the district court erred in granting Homeward's summary judgment motion as to McGinnis's Georgia RICO Act claim. Both parties also challenge the district court's post-trial decisions: Homeward contends that the district court erred in denying Homeward's renewed motion for JMOL and motion for a new trial on the grounds that (1) McGinnis failed to prove that Homeward's increase of her escrow calculation was improper, and (2) McGinnis was not entitled to recover emotional distress damages, while McGinnis argues that the district court erred in granting Homeward JMOL on the issue of specific intent.[7] We will address each issue in turn.

---

[7]    McGinnis also raises the issue whether she can recover emotional damages caused by Homeward's wrongful foreclosure without having to separately prove the tort of IIED, stating the following:

> Jane's appeal of this issue is conditional because the jury did, in fact, find that Jane had satisfied the additional elements of IIED, and so there is no need to address this third issue if the Court affirms the district court's judgment on that claim. R-93 at 2. And because the trial court instructed the jury that, for Jane's conversion and interference with property rights claims, she did not have to prove the elements of IIED to recover emotional damages, there is also no need to address this third issue if the Court affirms the district court's judgment on those claims. R-110 at 133. The Court must decide this issue only if, based on Homeward's cross-appeal, the Court directs judgment as a matter of law on all of Jane's claims except her wrongful foreclosure claim or if the Court orders any new trial involving Jane's wrongful foreclosure claim.

Because—as will be further discussed below—we are not directing the entry of judgment as a matter of law in favor of Homeward on all of her claims except wrongful foreclosure, nor are we ordering a new trial on her wrongful foreclosure claim, we need not reach this third issue.

11

A.    Summary Judgment on McGinnis's Georgia RICO Act Claim

First, we consider McGinnis's challenge to the district court's granting of summary judgment to Homeward on her Georgia RICO Act claim. We review this claim de novo, "reviewing all facts and reasonable inferences in the light most favorable to the nonmoving party, and applying the same standard as the district court." Allison v. McGhan Medical Corp., 184 F.3d 1300, 1306 (11th Cir. 1999). A grant of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Reasoning that Homeward's acts constituted a "single extended transaction," rather than a "pattern of racketeering activity," the district court ruled that McGinnis could not establish her RICO claim. On appeal, McGinnis asserts that a 2001 amendment to the Georgia RICO Act eliminated what she terms the "single transaction defense," and thus the district court should not have dismissed her claim. In the alternative, McGinnis argues that, contrary to the district court's opinion, Homeward's conduct constituted at least two separate transactions, and hence can qualify as a "pattern of racketeering activity." Whether or not McGinnis's reading of the amended language is more faithful to legislative intent, however, we find that the district court properly granted summary judgment to Homeward on McGinnis's Georgia RICO claim.

12

Georgia courts have long held that a single extended transaction cannot provide the basis for a Georgia RICO claim. See Sec. Life Ins. Co. of Am. v. Clark, 535 S.E.2d 234, 238 (Ga. 2000) (recognizing the single transaction defense); Stargate Software Int'l, Inc. v. Rumph, 482 S.E.2d 498, 503 (Ga. Ct. App. 1999) ("The fact that elements of two crimes may have been present at two separate points in time does not create two predicate acts out of what is in reality a single transaction."); Cobb v. Kennon Realty Servs., Inc., 382 S.E.2d 697, 699 (Ga. Ct. App. 1989) (affirming summary judgment on Georgia RICO claim based on "one extended transaction"). See generally S. Intermodel Logistics, Inc. v. D.J. Powers Co., Inc., 10 F. Supp. 2d 1337, 1359 (S.D. Ga. 1998) (discussing Georgia state court cases involving the single transaction defense).

Although this single transaction defense has been consistently recognized by Georgia state and federal courts since the Georgia RICO Act was amended in 2001,[8] McGinnis claims that the 2001 amendment eliminated that defense. This is so because the amendment changed the definition of "pattern of racketeering

---

[8]    See, e.g., Duncan v. CitiMortgage, Inc., No. 1:13-CV-1493-TWT, 2014 WL 172228, at *10 (N.D. Ga. Jna. 15, 2014), aff'd on other grounds, Nos. 14-10625, 14-1334, 2015 WL 3718963, at *4 (11th Cir. June 16, 2015); Belcher v. Onewest Bank, FSB, No. 1:12-CV-000960-AT, 2012 U.S. Dist. LEXIS 190265, at *15 (N.D. Ga. Sept. 10, 2012); Franklin v. Consus Ethanol, LLC, No. 1:11-CV-4062-TWT, 2012 WL 3779093, at *3-4 (N.D. Ga. Aug. 29, 2012); Foxworthy Inc. v. CMG Life Servs., Inc., No. 1:11-CV-2682-TWT, 2012 WL 1269127, at *7 (N.D. Ga. Apr. 16, 2012); Dial HD, Inc. v. Clearone Commc'ns, Inc., No. CV 109-100, 2010 WL 3732115, at *16 (S.D. Ga. Sept. 7, 2010); Rosen v. Protective Life Ins. Co., No. 1:09-cv-03620-WSD, 2010 WL 2014657, at *6 (N.D. Ga. May 20, 2010); Pollman v. Swan, 723 S.E.2d 290, 292 n.3 (Ga. Ct. App. 2011); Smith v. Chemtura Corp., 676 S.E.2d 756, 761 (Ga. Ct. App. 2009); Overton v. State, 671 S.E.2d 507, 517 (Ga. Ct. App. 2008).

13

activity" from the pre-2001 version of "engaging in <u>at least two incidents</u> of racketeering activity that have same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated," O.C.G.A. § 16-14-3(8) (2000) (emphasis added), to the post-2001 version of "engaging in <u>at least two acts</u> of racketeering activity in furtherance of <u>one or more incidents, schemes, or transactions</u> that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated." O.C.G.A. § 16-4-3(4)(A) (2015) (emphasis added).

According to McGinnis, the plain meaning of the "<u>one</u> or more . . . transactions" language adopted by Georgia General Assembly's amendment clearly provides that a pattern of racketeering can arise out of even a <u>single</u> transaction. Notably, however, McGinnis does not cite any cases for the proposition that the single transaction defense was eliminated by the 2001 amendment, nor does she point to any legislative history supporting her contention that the 2001 amendment was intended to eliminate that defense.

In considering the significance of the textual changes to the statute, we note some analytical complexities injected by the new language. Before, the text of the statute directed courts to look to whether there was evidence of two or more "incidents" (or predicate acts) of racketeering activity. § 16-14-3(8)(A) (2000). With the amended language, the definition appears to break down the notion of "at

14

least two incidents of racketeering activity" into two separate components: (1) "at least two acts of racketeering activity," and (2) "in furtherance of one or more incidents, schemes, or transactions." § 16-14-3(4)(A) (2015). Although the same general concepts are at play in both versions, the newer language breaks the concepts down and demands more precision from courts in determining the number of predicate acts and the number of transactions at issue.

Although it is plausible that this amended language may have been enacted to preclude the single transaction defense, we need not reach that question here— for this is not a case where the distinction would avail McGinnis.

Georgia courts have held that "[a] pattern requires at least two interrelated predicate offenses," Brown v. Freedman, 474 S.E.2d 73, 77 (Ga. Ct. App. 1996), and such acts must be linked, but distinguishable enough to not be merely "two sides of the same coin." S. Intermodal Logistics, Inc. v. D.J. Powers Co., 10 F. Supp. 2d 1337, 1359 (quoting Raines v. State, 467 S.E.2d 217, 218 (Ga. Ct. App. 1996)).

Under the traditional analysis, the facts in this case constitute a single extended transaction—and the two predicate acts asserted by McGinnis (i.e., theft by conversion in the taking of fees from the funds in the suspense account, and theft by taking in the wrongful foreclosure of the property) are most accurately viewed as "two sides of the same coin."

15

Homeward increased the McGinnis's escrow payment on the loan on the 172 Hilton Street Property, and McGinnis disputed the increase; according to the procedures laid out in the security deed, McGinnis's payments were (if wrongly) deemed partial, were consistently placed in a suspense account, resulting in the continual accrual of late fees and other fees; after a lengthy dispute about the escrow payment increase, Homeward foreclosed on the property. Although Homeward's misconduct manifested itself through various acts over this timeline, it all came down to a single core thread: Homeward failed to back down from and correct a significant and evident miscalculation in its demanded escrow payment from November 2009 to March 2010. Everything that occurred regarding McGinnis's loan on the 172 Hilton Street property—and everything that happened in lockstep with the other six loans, according to the family rider provision that tied the loans together—was the logical (if wrongful) result of that same core thread of misconduct. Thus, under the pre-2001 amendment approach, the district court correctly granted summary judgment on this claim.

Even assuming, arguendo, that the 2001 amendment to the Georgia RICO Act theoretically permits a claim to proceed involving only a single transaction, McGinnis's claim would still fail.

Under the amended language, to demonstrate a "pattern of racketeering activity," a plaintiff must show "at least two [predicate] acts of racketeering

16

activity." § 16-14-3(4)(A). Thus, just as courts sought evidence of two or more "incidents of racketeering activity" under the older language, the newer text still calls for courts to look for evidence of at least two predicate acts—and both versions of the statute include essentially the same laundry list of predicate offenses that are encompassed by the statute, including theft. Compare O.C.G.A. § 16-14-3(9)(ix) (2000) (including "Article 1 of Chapter 8 of this Title, relating to theft"), with O.C.G.A. § 16-14-3(5)(A)(xii) (2015) (including "Theft in violation of Article 1 of Chapter 8 of this title").

Accordingly, it still falls to courts to inquire into whether a defendant has committed two or more predicate acts in order to determine if the defendant has engaged in a pattern of such acts—as opposed to an isolated act. However, even speaking in these terms, the concern still remains that "the two alleged predicate incidents must be sufficiently 'linked' to form a RICO pattern, but nevertheless sufficiently distinguishable so that they do not become 'two sides of the same coin.'" S. Intermodal Logistics, Inc., 10 F. Supp. 2d at 1359 (quoting Raines, 467 S.E.2d at 218). Hence, while alleged predicate acts can be too dissimilar and disconnected to constitute a pattern of racketeering activity, such acts can also be too indistinguishable to give rise to such a pattern—even if a court could technically ascribe more than one criminal offense to different aspects of the conduct.

17

Under this reading, the two predicate acts asserted by McGinnis are still most appropriately viewed as "two sides of the same coin." Again, everything that occurred regarding McGinnis's loan on the 172 Hilton Street property was the logical result of that same core thread of misconduct. Thus, even under McGinnis's reading, Homeward's essential actions were not sufficiently distinguishable predicate acts to constitute a pattern of racketeering activity, and the district court correctly granted summary judgment on this claim.

For these reasons, McGinnis's Georgia RICO Act claim fails under either the pre- or the post-2001 amendment's language. Although we are not foreclosing the possibility that, under certain circumstances, a claim involving a single transaction and two sufficiently distinct predicate acts may well establish a viable RICO claim, this is not that case.

### B.    Post-Trial Motions Under Rule 50(b) and Rule 59

Federal Rule of Civil Procedure 50(a)(2) provides that a party may move for judgment as a matter of law "before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). "The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." Id. If a district court does not grant the motion, the movant may file "a renewed motion," under Rule 50(b), after trial. Fed. R. Civ. P. 50(b).

18

"The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion [under 50(a)]." Chaney v. City of Orlando, 483 F.3d 1221, 1227 (11th Cir. 2007) (alteration in original) (quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2537 (2d ed. 1995)). Thus, as with motions under Rule 50(a), the question before a district court confronting a renewed Rule 50(b) motion is whether the evidence is "legally sufficient . . . to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).

In considering whether the verdict is supported by sufficient evidence, "the court must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party." Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1560 (11th Cir. 1995). And, as we have stressed, "[i]t is the jury's task—not [the court's]—to weigh conflicting evidence and inferences, and determine the credibility of witnesses." Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 715 (11th Cir. 2002) (quoting Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001)).

A ruling on a party's "motion for judgment as a matter of law is reviewed de novo, applying the same legal standard as the district court." Bianchi v. Roadway Express, Inc., 441 F.3d 1278, 1282 (11th Cir. 2006); see also Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co., 320 F.3d 1260, 1267-68 (11th Cir. 2003) ("We

19

review a district court's grant of judgment as a matter of law de novo, evaluating whether such sufficient conflicts exist in the evidence to necessitate submitting the matter to the jury or whether the evidence is so weighted in favor of one side that one party must prevail as a matter of law." (quoting Thosteson v. United States, 304 F.3d 1312, 1316 (11th Cir. 2002))).

A losing party may also move for a new trial under Rule 59 on the grounds that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair . . . and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940). Thus, under Rule 59(a), a district court may, in its discretion, grant a new trial "if in [the court's] opinion, the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1556 (11th Cir. 1984) (second alteration in original) (quoting United States v. Bucon Constr. Co., 430 F.2d 420, 423 (5th Cir. 1970)) (internal quotation marks omitted).

"Although a trial judge cannot weigh the evidence when confronted with a motion [for judgment] notwithstanding the verdict, in a motion for a new trial the judge is free to weigh the evidence." Rabun v. Kimberly-Clark Corp., 678 F.2d

20

1053, 1060 (11th Cir. 1982) (quoting <u>King v. Exxon Co., U.S.A.</u>, 618 F.2d 1111, 1115 (5th Cir. 1980)). "[W]hen independently weighing the evidence, the trial court is to view not only that evidence favoring the jury verdict but evidence in favor of the moving party as well." <u>Williams v. City of Valdosta</u>, 689 F.2d 964, 973 (11th Cir. 1982).

We review a ruling on a motion for a new trial for abuse of discretion. <u>Middlebrooks v. Hillcrest Foods, Inc.</u>, 256 F.3d 1241, 1247 (11th Cir. 2001). "Deference to the district court 'is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed.'" <u>Id.</u> at 1247-48 (quoting <u>Rosenfield v. Wellington Leisure Prods., Inc.</u>, 827 F.2d 1493, 1498 (11th Cir. 1987)).

### 1.    *Proof of Improper Escrow Payment Increase*

At trial, McGinnis advanced three primary arguments on liability: (1) Homeward increased her escrow deposit without proper notice, (2) Homeward increased her escrow deposit by an unreasonable amount, and (3) Homeward did not properly apply her monthly payments. In its cross-appeal, Homeward asserts that the district court erred in denying its Rule 50(b) and Rule 59 motions, given that McGinnis failed to prove each of these grounds for liability. We will treat each argument in turn.

21

a.    Notice of the escrow increase

Beginning in November 2009 and continuing through March 2010, Homeward increased McGinnis's escrow deposit from $115.45 to $353.45. McGinnis claims that in making this increase, Homeward did not provide her with proper notice. Homeward claims that it did provide proper notice, in the form of a payment coupon in October 2009. Homeward is mistaken.

RESPA[9] requires that, among other things, "[i]f the new servicer changes either the monthly payment amount or the accounting method . . . then the new servicer shall provide the borrower with an initial escrow account statement within 60 days of the date of servicing transfer." 24 C.F.R. § 3500.17(e)(1).

Homeward did not provide an "initial escrow account statement" within 60 days of the servicing transfer. Adam testified that he did not receive any escrow analysis explaining the escrow deposit increase to $353.45. The earliest escrow analysis McGinnis received was Homeward's December 17, 2009 escrow analysis, but that analysis did not explain the escrow deposit increase to $353.45—and Homeward actually withdrew it and told McGinnis to ignore it. See also McGinnis v. Am. Home Mortg. Servicing Inc., No. 5:11-CV-284 (CAR), 2013 WL 3338922, at *13 n.164 (M.D. Ga. July 2, 2013) (rejecting the December 17 escrow analysis because "the time . . . is [at least] 61 days, not 60").

---

[9]    Again, under the terms of the security deeds, the lender voluntarily agreed to calculate and collect escrow payments according to RESPA's requirements.

22

Homeward responds that Adam admitted to receiving one payment coupon in October 2009, but this coupon says essentially nothing more than "Monthly Payment 843.58." And the coupon is clearly not an "initial escrow account statement." See 12 C.F.R. § 1024.17(g)-(h) (2014) (describing the content and format of initial escrow account statements).

Moreover, as the district court aptly noted, "when Mr. McGinnis acknowledged that Plaintiff may have received this payment coupon, he also testified that, even if the coupon was attached to the letter, it would have been questioned because it wrongly showed her to be behind in payments." McGinnis, 2014 WL 2949216, at *5. Overall, the district court correctly found that "a reasonable jury could conclude that . . . she was not sufficiently notified of a legitimate increase in her monthly payment or of an escrow shortage at that time." Id.

    b.    Reasonableness of the escrow increase

Homeward next contends that McGinnis failed to show that the escrow deposit increase was unreasonable. Again, Homeward's argument is unavailing.

The deed requires that Homeward "shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law." The deed also

23

provides that payment of escrow shortages must be spread out over a twelve-month period.[10]

The district court succinctly and correctly summarized the compelling circumstantial evidence of the unreasonableness of the escrow increase that was presented to the jury as follows:

> At trial, the jury was also instructed that, if there was a shortage in Plaintiff's escrow, Homeward only had two options under the terms of the Security Deed: It could choose to either allow a shortage to exist or require Plaintiff "to repay the shortage in equal monthly payments over at least twelve months." The jury was then presented with evidence that Homeward's escrow increase would have recouped any shortage in much less than twelve months and that if the amount demanded was collected over twelve months, the escrow collected would total two or three times the amount needed to cover Plaintiff's tax and insurance costs. The evidence additionally showed that Homeward performed a third escrow analysis, in February of 2010, that reduced Plaintiff's payment from $843.58 to $638.32, a number much more in line with what she had previously been paying. Yet, Homeward still insisted that Plaintiff owed payments of $843.59 from November, 2009 through April, 2010.

> From this circumstantial evidence, a reasonable jury could have inferred that the payments demanded by Homeward were

---

[10]    Homeward did not object to a jury instruction that said as much. McGinnis, 2014 WL 2949216 at *16 n.50.

In its reply brief, Homeward now asserts that the "no more than 12 monthly payments" language would have permitted it to collect the alleged escrow shortage in fewer than twelve months. However, the deed states that if there is a shortage, "Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments." As RESPA requires that payments be "at least a 12-month period," 12 C.F.R. §§ 1024.17(f)(3)(i)(C), (3)(ii)(B), and given that the FAQ section in Homeward's own escrow statement says that "[s]hortage[s] are collected over a 12 month period," there is surely sufficient evidence for the jury to have concluded that Homeward was obligated to recoup any shortage over no more and no less than twelve months.

24

unreasonable and that, by demanding these payments, Homeward breached a duty owed to Plaintiff.

On this issue, Mr. McGinnis also testified that he knew the increase was an error based on his calculations and experience managing Plaintiff's properties. This went factually unrebutted by Homeward, as it chose not to offer any evidence as to exactly how it arrived at the $843.58 payment. The evidence in the case instead showed that Plaintiff repeatedly brought this error to Homeward's attention, but Homeward failed to verify or produce a copy of the October 2009 escrow analysis. The jury could have reasonably considered this as evidence of Homeward's knowledge of its breach and refusal to correct it in violation of its duty to comply with the Security Deed.

McGinnis, 2014 WL 2949216 at *6.

Homeward now argues that McGinnis's evidence does not address "escrow items," "deficiencies," "shortages," "time for recoupment," and a "two month cushion." However, these issues were all addressed by the documentary and testamentary evidence introduced at trial, and the jury was fully capable of reviewing the evidence, drawing reasonable deductions and inferences, deciding what is material, and making ultimate findings on these issues. Moreover, Adam's escrow analysis, which was introduced in evidence, did in fact touch on several of these items.

The fact that Homeward failed to offer any clear evidence at trial explaining how exactly it arrived at the $843.58 payment speaks volumes. Indeed, it was unreasonable for Homeward to expect from McGinnis a comprehensive, in-depth escrow analysis, when Homeward itself failed to produce one.

25

c.    Application of monthly payments

Finally, Homeward challenges McGinnis's claim that the monthly payments were wrongfully applied. But because this argument stands or falls with the argument regarding the reasonableness of the escrow increase, it must also fall.

Neither party disputes that McGinnis's account was not credited as her monthly payments were made and that Homeward instead placed her monthly payments in a suspense account until additional funds arrived. Homeward argues that it was entitled to withhold the funds in the suspense account under the terms of the Security Deed. This argument, however, "assumes that Plaintiff's monthly payments were reasonable and correct and thus that Plaintiff was required to pay the amount Homeward charged." McGinnis, 2013 WL 3338922, at *16.

If, at trial, the jury found that the monthly payments demanded by Homeward were unreasonable and incorrect, then it follows that the jury could also have found that Homeward was not entitled to hold McGinnis's monthly payments in suspense. Accordingly, we find that a reasonable jury could, based on this evidence, also conclude that Homeward did not properly credit payments to McGinnis's account.

* * *

We conclude that the district court correctly ruled that McGinnis met her evidentiary burden to prove liability at trial. Under Rule 50(b) , given that the

26

evidence does not "overwhelmingly" favor Homeward, Vahlco Corp., 720 F.2d at 889) (quoting Boeing Co., 411 F.2d at 374), Homeward is not entitled to judgment as a matter of law. Moreover, under Rule 59, given that the verdict was not "against the clear weight of the evidence," Hewitt, 732 F.2d at 155 (quoting Bucon Constr. Co., 430 F.2d at 423), Homeward is not entitled to a new trial on this issue.

### 2.    *Emotional Distress Damages*

Homeward also argues that the district court erred in finding that its acts constituted "extreme and outrageous conduct" as a matter of law, such that Homeward was not entitled to JMOL or a new trial on the issue of damages for emotional distress.[11] Once more, we disagree.

"Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law." Racette v. Bank of Am., N.A., 733 S.E.2d 457, 465 (Ga. Ct. App. 2012) (quoting Frank v. Fleet Finance, Inc. of Ga., 518 S.E.2d 717, 720 (Ga. Ct. App. 1999)). To support a claim of IIED, the conduct at issue must "go beyond all reasonable bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized community" and "naturally give rise to such intense

---

[11]    In order to sustain an IIED claim under Georgia law, a plaintiff must show that (1) the conduct giving rise to the claim was either intentional or in reckless disregard for the rights of others; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. See Racette v. Bank of Am., N.A., 733 S.E.2d 457, 465 (Ga. Ct. App. 2012) (quoting Frank v. Fleet Finance, Inc. of Ga., 518 S.E.2d 717, 720 (Ga. Ct. App. 1999)). On appeal, Homeward challenges the district court's decision as to only the "extreme and outrageous conduct" element.

27

feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress." United Parcel Serv. v. Moore, 519 S.E.2d 15, 17 (Ga. Ct. App. 1999) (quoting Peoples v. Guthrie, 404 S.E.2d 442, 444 (Ga. Ct. App. 1991)).

"[I]t is true that an intentional wrongful foreclosure can be the basis for an action for intentional infliction of emotional distress" under certain circumstances. Blue View Corp. v. Bell, 679 S.E.2d 739, 742 (Ga. Ct. App. 2009) (quoting Ingram v. JIK Realty Co., 404 S.E.2d 802, 805 (Ga. Ct. App. 1991)). However, a finding of wrongful foreclosure does not, of itself, mean that the misconduct at issue "rises to the level of extreme, outrageous, atrocious or intolerable conduct required to support a claim for intentional infliction of emotional distress." Clark v. PNC Bank, N.A., No. 1:13-cv-1305-WSD, 2014 WL 359932, at *6 (N.D. Ga. Feb. 3, 2014). Nor are "[s]harp or sloppy business practices" generally considered "as going beyond all reasonable bounds of decency as to be utterly intolerable in a civilized community." Moore, 519 S.E.2d at 17. When there is evidence of more egregious conduct, however, Georgia courts have held that a jury can properly infer intentional infliction of emotional distress in actions related to a wrongful

28

foreclosure.[12] And as the district court correctly found, "this is one of those cases." McGinnis, 2014 WL 2949216 at *11.

A number of factors demonstrate the extreme and outrageous nature of Homeward's conduct. For one thing, evidence indicated that over the course of Homeward's relationship with McGinnis, Homeward's agents frequently harassed McGinnis by phone and mail. Because Homeward's misconduct involved all seven properties, McGinnis alleges that this harassment has become a constant fixture of their lives—and in fact, "if you stacked all the collection letters together," they would reach "[f]ive feet high." See, e.g., Margita v. Diamond Mortg. Corp., 406 N.W.2d 268, 272 (Mich. Ct. App. 1987) ("Continuous unnecessary harassment over a nearly two-year period by a company whose main business is servicing such mortgages . . . might easily be viewed as extreme and outrageous conduct under the circumstances.").

Even more crucially, however, we find that Homeward's awareness of its error rendered its opaqueness, unresponsiveness, and belligerence—in pursuing foreclosure in a fairly short amount of time for a relatively small amount of money—extreme and outrageous as a matter of law. The evidence introduced at

---

[12]    See, e.g., Kerfoot v. FNF Servicing, Inc., No. 1:13-cv-33(WLS), 2013 WL 5797662, at *6 (M.D. Ga. Oct. 25, 2013) (finding complaint adequately pled IIED claim where it alleged that mortgage company had been notified numerous times of the unlawfulness of the loan and yet "hounded the [plaintiffs] with letters and calls demanding payment at the threat of foreclosure"); DeGolyer v. Green Tree Servicing, LLC, 662 S.E.2d 141, 148 (Ga. Ct. App. 2008) (finding evidence to support IIED claim where plaintiff informed defendant that it was foreclosing on the wrong tract of property, but defendant nevertheless proceeded with foreclosure).

trial showed that, through Adam, McGinnis repeatedly notified Homeward of errors in the handling of her account and attempted to resolve the errors in good faith. However, McGinnis's months of requests for clarification and correction were fruitless. Homeward's agents continually failed to justify the increased payment, insisted that McGinnis was behind in payment, and—despite Homeward's own tacit admission of its erroneous calculation and subsequent decrease in the escrow amount—failed to retract its demand that McGinnis pay the inflated amount.

This case is not unlike the case of DeGolyer v. Green Tree Servicing, LLC, 662 S.E.2d 141 (Ga. Ct. App. 2008), in which the court held that action in light of a known error can constitute extreme and outrageous conduct and "support a claim for mental anguish damages." Id. at 148. Although DeGolyer involved knowledge that the wrong property was being foreclosed upon, that distinction is merely a matter of degree. In both DeGolyer and the present case, the defendants knew that clerical or other error rendered their acts fundamentally mistaken, and yet they callously proceeded to foreclosure without resolving errors that only they could investigate and correct.

Moreover, as the district court observed,

Homeward's Rule 30(b)(6) witness, Christopher Delbene, may have in fact provided the jury with some insight into the attitude or approach employed by Homeward in this process. During his testimony, Delbene insisted that the 2009 escrow analysis was correct,

30

even though he had not seen the document and had not attempted to calculate the escrow. Delbene then suggested that Plaintiff was required to pay any amount Homeward demanded, regardless of whether it appeared reasonable or in error, simply because that is what she "agreed to under the note and mortgage."

McGinnis, 2014 WL 2949216, at *11. This attitude is borne out by the facts of this case, and by Homeward's proceeding with forfeiture despite the fact that McGinnis never missed a monthly payment.

As noted by the district court, "[a]lthough this was not Plaintiff's residence, the evidence did show that this property and all of the others threatened with foreclosure are Plaintiff's livelihood, her nest egg, her security, her life's work, and a representation of her character in the community. Plaintiff likewise provided evidence from which the jury could find that all of this has had a severe effect on Plaintiff both emotionally and physically." Id. at *12. In numerous communications with McGinnis by telephone, fax, and mail, Homeward almost certainly learned the stakes involved with the foreclosure, and yet it never looked back.

As with Homeward's other cross-appeal claim, we conclude that the district court correctly ruled that, as a matter of law, Homeward's conduct was outrageous and extreme enough to support McGinnis's IIED claim. Under Rule 50(b), given that the evidence does not "overwhelmingly" favor Homeward, Vahlco Corp., 720 F.2d at 889) (quoting Boeing Co., 411 F.2d at 374), Homeward is not entitled to

31

judgment as a matter of law. Moreover, under Rule 59, given that the verdict was not "against the clear weight of the evidence," Hewitt, 732 F.2d at 1556 (quoting Bucon Constr. Co., 430 F.2d at 423), Homeward is not entitled to a new trial.

### 3.    Specific Intent

Finally, McGinnis challenges the district court's ruling that Homeward was entitled to judgment as a matter of law on the issue of specific intent, and that McGinnis was thus entitled to only $250,000 in punitive damages.

Georgia law provides a bifurcated procedure for assessing the award of punitive damages. O.C.G.A. § 51-12-5.1(d)(1)-(2). In the first phase, the jury "shall first resolve from the evidence produced at trial whether an award of punitive damages shall be made." § 51-12-5.1(d)(1). During this phase, "[p]unitive damages may be awarded . . . [if] it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct . . . or that entire want of care which would raise the presumption of conscious indifference to the consequences." § 51-12-5.1(b).

In the second phase, if the jury has determined that an award of punitive damages is warranted, "the trial shall immediately be recommenced in order to receive such evidence as is relevant to a decision regarding what amount of damages will be sufficient." § 51-12-5.1(d)(2). And in order for the award to exceed the statutory cap of $250,000, see § 51-12-5.1(g)—in tort cases that do not

32

involve products liability—the injured party must prove by a preponderance of the evidence "that the defendant acted, or failed to act, with the specific intent to cause harm." O.C.G.A. § 51-12-5.1(f); see also Kothari v. Patel, 585 S.E.2d 97, 100-02 (Ga. Ct. App. 2003).

In its JMOL motion under Rule 50(b), Homeward argued that, because McGinnis failed to offer evidence that Homeward acted with specific intent to cause the harm, the jury's award of $3,000,000 in punitive damages should be reduced to $250,000. Finding that Homeward had properly preserved this argument during trial, and concluding that the evidence was insufficient for the jury to find specific intent, the district court granted Homeward's motion for JMOL on this issue and reduced McGinnis's punitive damages award to $250,000.

On appeal, McGinnis argues that the district court erred in granting JMOL on the issue of specific intent because Homeward did not request JMOL on that issue during trial.

Again, a motion for JMOL may be brought under Rule 50(a) "at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). Such a motion "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Id. Rule 50(b), in contrast, expressly provides only for renewed

33

JMOL motions,[13] and thus a district court can grant a Rule 50(b) motion "only on grounds advanced in the preverdict [Rule 50(a)] motion," Fed. R. Civ. P. 50 advisory committee's note to 2006 amendment. As we have noted previously, a primary rationale behind this requirement

> is to avoid making a trap of the motion for judgment notwithstanding the verdict, either at the trial stage or on appeal. When a claimed deficiency in the evidence is called to the attention of the trial judge and of counsel before the jury has commenced deliberations, counsel still may do whatever can be done to mend his case. But if the court and counsel learn of such a claim for the first time after verdict, both are ambushed and nothing can be done except by way of a complete new trial. It is contrary to the spirit of our procedures to permit counsel to be sandbagged by such tactics or the trial court to be so put in error.

Quinn v. Sw. Wood Prods., Inc., 597 F.2d 1018, 1025 (5th Cir. 1979).[14] However, "[b]ecause the rule is a harsh one, we have taken a liberal view of what constitutes a motion for directed verdict." Nat'l Indus., Inc. v. Sharon Steel Corp., 781 F.2d 1545, 1549 (11th Cir. 1986).

Accordingly, we have recognized an exception to that rule when confronting grounds that are "closely related" to those raised in an initial JMOL motion. "If the grounds argued in a motion under Rule 50(a) are 'closely related' to those argued

---

[13]    If a party altogether fails to assert a Rule 50(a) motion on any grounds, we have recognized "that a subsequent motion for jnov can be granted only if plain error can be proven." Sims' Crane Serv., Inc. v. Ideal Steel Prods., Inc., 800 F.2d 1553, 1557 (11th Cir. 1986) (emphasis added) (citing Wilson v. Attaway, 757 F.2d 1227 (11th Cir. 1985)).

[14]    Fifth Circuit decisions issued before September 30, 1981, are binding on the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).

in a Rule 50(b) motion, then setting aside a jury's verdict is no surprise to the non-movant. No Seventh Amendment right [to cure any defects] is ambushed." Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1289 (11th Cir. 1998) (quoting Nat'l Indus., Inc., 781 F.2d at 1549). However, "if the new and old grounds vary greatly . . . and the trial court relies upon the new grounds to set aside the jury's verdict, we will reverse." Id. (citing Sulmeyer v. Coca Cola Co., 515 F.2d 835, 845-46 (5th Cir. 1975)); see also Abel v. Dubberly, 210 F.3d 1334, 1338 (11th Cir. 2000) ("If the two sets of grounds are closely related, then no Seventh Amendment violation exists because the non-movant was not subjected to unfair surprise; however, if the grounds are not closely related, then the district court may not rely on the later-advanced grounds in granting the motion.").

In its Rule 50(a) motion, Homeward did not assert or even discuss the issue of specific intent to cause harm, nor did it mention punitive damages. However, in the district court's ruling on Homeward's Rule 50(b) motion, it stated that

> In this case, Homeward did argue that there was "no evidence of specific intent" prior to the close of evidence. Although Homeward did not raise this argument in the context of punitive damages during trial, Homeward's arguments regarding the instruction on intent and emotional damages at the charge conference were closely related to those raised in the present motion. Because Homeward raised a similar argument earlier, Plaintiff cannot argue that she has now been ambushed with an entirely new legal argument.

McGinnis v. Am. Home Mortg. Servicing Inc., No. 5:11-CV-284 (CAR), 2014 WL 2949216, at *14 (M.D. Ga. June 30, 2014). Accordingly, the district court held that

35

Homeward's specific intent argument had not been waived. A closer look at Homeward's arguments at trial, however, reveals otherwise.

Homeward moved for judgment as a matter of law specifically as to McGinnis's claims of conversion, wrongful foreclosure, interference with property rights, and IIED. As to conversion, Homeward argued that it was authorized by the deed and note to remove fees from the suspense account. As to wrongful foreclosure and interference with property rights, Homeward essentially repeated its same argument that its decisions complied with the deed and note. And finally, as to IIED, Homeward again repeated its same argument that its decisions complied with the deed and note, and also asserted that there was no evidence to prove the required element of extreme and outrageous conduct.

The grounds raised in Homeward's Rule 50(a) motion did not address specific intent to cause harm. In fact, the only statement that comes close to the subject of specific intent—and the one that was apparently determinative for the district court—was a one-sentence comment made in the course of a legal argument as to the proper standard to include in a jury instruction regarding emotional damages for wrongful foreclosure. This statement, made by Homeward's attorney Mr. Rogers during a jury charge conference, goes as follows:

> I'm not aware of a holding from the Court of Appeals that says that you can get emotional damages for an intentional wrongful foreclosure.

36

So I don't think that is consistent with Georgia Law, Your Honor. And I think maybe this would ultimately redound to my benefit, but Mr. Gower is now trying to turn wrongful foreclosure into an intentional tort which would require a specific intent presumably. And just to be honest there isn't any evidence of specific intent in this case.

Mr. Delbene testified that the computer spat out a list and somebody confirmed that the payment hadn't been made required to bring it current.

So, you know, I think that the wrongful foreclosure claim is—my motion starts sounding better if you include the intentional element in there, Your Honor. It's just not an intentional tort.

This remark, whether viewed alone or in context, does not constitute a ground closely related to the specific intent argument that Homeward raised—for the first time—in its post-verdict Rule 50(b) motion. Homeward's arguments during the charge conference address a question of Georgia law regarding whether the tort of wrongful foreclosure includes an "intentional element in there." They do not relate to the separate argument regarding the sufficiency of McGinnis's evidence vis-à-vis Homeward's specific intent to cause harm. Moreover, Mr. Rogers' generic reference to the evidence on intent does not transform that discussion of legal elements of wrongful foreclosure into a request for judgment as a matter of law regarding specific intent to cause harm—nor does it provide sufficient notice to either McGinnis or the district court of a potential evidentiary infirmity.

37

Applying our "liberal view of what constitutes a motion for directed verdict," a party must "clearly point[] out a claimed evidentiary deficiency to court and counsel, not by way of <u>conversation</u> or <u>speculation</u> but on the record in an unambiguous formal motion for relief." <u>Quinn</u>, 597 F.2d at 1025 (emphasis added). Were we to permit otherwise, trial courts would be required to countenance countless post hoc challenges to verdicts based on such general comments made at any time during a trial, and the exception would engulf the rule. In fact, the statement by Mr. Rogers here is a prime example of the sort of speculative comment which we referred to in <u>Quinn</u> that—unmoored from any discussion or formal motion regarding the sufficiency of the evidence of Homeward's specific intent—failed to provide sufficient notice of a forthcoming evidentiary challenge[15] to either McGinnis or the district court. <u>See</u> <u>id.</u>

In addition to Mr. Rogers' previous remark at the charge conference, Homeward asserts that Mr. Rogers later made a closely related argument in his oral Rule 50(a) motion when he stated that "there's no evidence that's been presented by [McGinnis] that [Homeward] acted inconsistent with its legal right," and that

---

[15] Homeward also contends that McGinnis has failed to show that she would have "correct[ed] her failure to present evidence on this issue." Because "McGinnis made no effort to introduce any additional evidence," Homeward reasons, a more explicit 50(a) argument about this evidentiary insufficiency would not have changed anything.

However, this argument is simply incorrect. With sufficient notice, McGinnis "could have chosen to provide additional testimony to address this issue" —for instance, "about the demeanor, the tone, and the nature of Homeward's representatives." Moreover, McGinnis's attorney could have known to sharpen the focus on this issue during closing arguments.

"there's no proof that what [Homeward] asked [Plaintiff] to pay was unreasonable and the evidence suggests it was reasonable." Again, these very general statements have nothing to do with intent, but instead relate to the issue of breach. Simply linking any argument made in support of a Rule 50(a) motion regarding evidentiary sufficiency does not open up every minimally related evidentiary challenge as fair game in a Rule 50(b) motion.

Aside from the substance of the "closely related" exception, McGinnis further asserts that the exception does not extend to arguments made during a jury charge conference. However, in Splitt v. Deltona Corp., 662 F.2d 1142 (5th Cir. 1981 Unit B), we held that a defendant's Rule 50(b) challenge was properly preserved and "[c]ounsel for plaintiffs was not ambushed" when the very same claim had been "strenuously" argued in the context of a challenge to a jury instruction. Id. at 1144.[16] Although, strictly speaking, that case did not involve a closely related ground—given that the arguments were identical—Splitt does at least stand for the proposition that a Rule 50(b) argument may, in some cases, be properly preserved by an argument clearly and unambiguously raised during a charge conference.

---

[16]    In Splitt, we also noted that a "comment of the trial judge at the conclusion of the argument seems to indicate he believed a proper predicate for a judgment notwithstanding the verdict had been laid. 'Well, I'm going to go ahead and give the charge. If I am wrong, you can move ten days after trial.' Record at 286. The trial judge was apparently referring to the ten-day rule in Fed. R. Civ. Proc. 50(b)." Splitt, 662 F.2d at 1144.

39

Had Mr. Rogers not simply made an offhand remark, but instead presented a fleshed out argument regarding the sufficiency of the evidence of Homeward's specific intent to harm during the charge conference, this case would be closer to Splitt.

That said, the setting of Homeward's purported Rule 50(a) argument implicates another dimension in this case. As mentioned above, the first phase of the bifurcated trial concerned the reckless disregard or a conscious indifference required to support a claim for punitive damages; the issue of specific intent to cause harm—the element required in order to exceed Georgia's statutory cap on punitive damages—arose only in the second phase. Accordingly, that issue was not pertinent to the jury during the first phase of trial, nor was it addressed in the jury's first set of instructions, nor would it have been relevant even if Homeward had specifically raised it in a Rule 50(a) motion at that point. That matter became relevant only after the jury found in favor of McGinnis and the trial recommenced for the second phase—during which Homeward made no JMOL motion on specific intent to cause harm, nor did it otherwise argue that punitive damages had to be limited to $250,000. Thus, not only did Homeward fail to offer a closely related ground to preserve its Rule 50(b) argument regarding specific intent to harm, but it failed to properly preserve that claim during the second phase of trial where it would have been properly raised—a conclusion that gives content to the

40

requirement that a court cannot rule on a Rule 50(a) motion until "a party has been fully heard on an issue during a jury trial." Fed. R. Civ. P. 50(a)(1) (emphasis added). McGinnis had not been "fully heard" on specific intent until after she rested during phase two. This is an independent reason to conclude that Homeward did not preserve its argument concerning intent.

For these reasons—and finding no other closely related Rule 50(a) ground offered by Homeward at trial—we will reverse the district court's determination that Homeward properly preserved its Rule 50(b) argument.

Homeward asserts that even if it did not properly preserve its 50(b) argument on that issue, it did in fact properly raise the ground in its Rule 59 motion for a new trial. Further, Homeward points out that "[a]lthough Rule 50(c)(1) directs the district court to rule on an alternative motion for a new trial when it grants a renewed motion for a judgment as a matter of law . . . the District Court explicitly withheld ruling on Homeward's Motion for New Trial on the issue of specific intent to harm." See McGinnis, 2014 WL 2949216 at *16 ("In light of [the district court's grant of Homeward's JMOL motion on specific intent], the Court need not consider Homeward's Motion for New Trial on this ground."). Because the district court declined to address this claim of Homeward's Rule 59 motion, Homeward argues, the case should be remanded for the district court to rule on it.

We agree. Rule 50(c)(1) states that

If [a district court] grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed. The court must state the grounds for conditionally granting or denying the motion for a new trial.

Here, after granting Homeward's renewed JMOL based on insufficient evidence of specific intent to harm, the district court declined to conditionally rule on this portion of Homeward's motion for a new trial, which made out the same argument as to specific intent, as well as the argument that the $3,000,000.00 punitive damages award violated due process. McGinnis, 2014 WL 2949216, at *16. Accordingly, we will remand the case for a ruling on Homeward's Rule 59 motion as to the issue of punitive damages. See Chaney, 482 F.3d at 1229 ("Rule [50(c)(1)] obligates the court to rule on a motion for a new trial when issuing its ruling on a renewed motion for judgment as a matter of law. Here, the district court failed to do so. Thus we also remand this case to permit the district court to properly consider . . . [the movant's] separate motion for a new trial.").

## IV.    CONCLUSION

For the foregoing reasons, the district court's ruling that Homeward's Rule 50(b) argument regarding specific intent was properly preserved is **REVERSED** and its order reducing the jury's award of $3,000,000 in punitive damages to $250,000 is **VACATED.** The case is **REMANDED** to the district court for consideration of Homeward's Rule 59 motion for a new trial on the issue of

42

punitive damages. On all other grounds raised in both the appeal and cross-appeal, the district court's determinations are **AFFIRMED.**

## **AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

JULIE CARNES, Circuit Judge, concurring in part and dissenting in part:

I join in all parts of the majority's very thorough opinion in this case, with one exception: its holding that Homeward's post-verdict Rule 50(b) motion for judgment as a matter of law ("JMOL") did not constitute a renewal of its pre-verdict Rule 50(a) motion because the latter did not adequately identify the issue later asserted in the Rule 50(b) motion. Homeward argued in this Rule 50(b) motion that McGinnis had failed to prove a specific intent by Homeward to cause harm. Without proof of this specific intent to harm, McGinnis's punitive damages were limited by statute to $250,000, meaning that the jury's award of three million dollars in punitive damages would have to be reduced. Concluding that Homeward had adequately preserved this argument—and that the evidence failed to establish this element—the district court granted Homeward's Rule 50(b) motion for judgment as a matter of law. Because I agree with the district court that the issue now advanced by Homeward was cognizable in its Rule 50(b) motion, I respectfully dissent from the majority opinion's holding to the contrary.

As the majority notes, a Rule 50(b) motion is considered to be a renewal of the party's trial motion for judgment as a matter of law under Rule 50(a). A Rule 50(a) motion must be made before the case has been submitted to the jury, and on terms sufficient to alert the opposing party and the court of the ground for the motion. *See* Fed. R. Civ. P. 50(a)(2). For that reason, a motion for judgment as a

44

matter of law under Rule 50(b) can be viable only to the extent it renews an earlier trial motion.  Otherwise, a sly movant, discerning a deficiency in his adversary's presentation of the evidence, could lie in wait, purposely delaying his JMOL motion until after a verdict when it would then be too late for the adversary to correct what might have been a readily fixable omission.  *See Quinn v. Sw. Wood Prods., Inc.*, 597 F.2d 1018, 1025 (5th Cir. 1979) ("When a claimed deficiency in the evidence is called to the attention of the trial judge and of counsel before the jury has commenced deliberations, counsel still may do whatever can be done to mend his case.").  Therefore, Rule 50(a)'s requirement that a movant make this motion before the case is submitted to the jury operates to prevent the movant's adversary from being "ambushed" or "sandbagged."  *Id.*

On the other hand, given the "harshness" of a determination that a Rule 50(a) motion was too imprecise to preserve a particular issue, "we have taken a liberal view" of what constitutes a compliant motion.  *Nat'l Indus., Inc. v. Sharon Steel Corp.*, 781 F.2d 1545, 1549 (11th Cir. 1986).  In *National Industries*, the defendant sought the equivalent of a JMOL[1] during trial on the plaintiff's claim for loss of future profits, but failed to mention in that motion a request for a JMOL on a claim for loss of goodwill and reputation.  In its post-verdict JMOL motion,

---

[1]  Prior to 1991, Rule 50(a) used the term "motion for directed verdict," instead of the present term "judgment as a matter of law," and Rule 50(b) used the term "judgment notwithstanding the verdict," often shortened to "jnov," instead of the present term "renewed motion for judgment as a matter of law."  *See* Amendments to the Federal Rules of Civil Procedure, 134 F.R.D. 525, 679–82 (1991).

however, the defendant also sought judgment on the latter claim, and the district court granted the motion.  Notwithstanding the defendant's omission of any mention of the goodwill/reputation claim in its Rule 50(a) motion, we nonetheless held that its Rule 50(a) motion "encompassed" that claim because the two issues were "closely related."  *Id.*  We also noted that "[e]ven if the subject matters of the two motions were much farther apart, we would not read Rule 50(b) so narrowly . . . ."  *Id*.  Noting that the purpose of the requirement of a pre-verdict motion is to avoid ambushing the non-movant, we concluded that the plaintiff had not been "lulled into complacency regarding the sufficiency of its evidence" on the particular claim.  *Id.*

Since *National Industries*, we have continued to characterize our approach to assessing the adequacy of a Rule 50(a) motion as being both liberal and flexible. *See Sims' Crane Serv., Inc. v. Ideal Steel Prods., Inc.*, 800 F.2d 1553, 1556–58 (11th Cir. 1986) (acknowledging circuit precedent that adopts "a flexible approach" and "look[s] not to the specific wording of the Rule 50(b) but toward its purpose," which purpose is "'to avoid making a trap' of the motion for jnov so that counsel is not 'ambushed' or 'sandbagged' regarding the sufficiency of the evidence he adduced"); *Rankin v. Evans*, 133 F.3d 1425, 1432–33 (11th Cir. 1998) (acknowledging the "liberal view" that our circuit has taken of what constitutes a motion for directed verdict and citing with approval *Scottish Heritable Trust, PLC*

46

*v. Peat Marwick Main & Co.*, 81 F.3d 606, 610 (5th Cir. 1996), which held that

"[t]echnical noncompliance with Rule 50(b) may be excused in situations in which

the purposes of the rule are satisfied," and *Parkway Garage, Inc. v. City of*

*Philadelphia*, 5 F.3d 685, 691 (3rd Cir. 1993), which found compliant a JMOL

motion that only implicitly raised the issue later advanced on the renewed JMOL

motion, because the court and counsel had actual notice of the basis of the motion);

*Etienne v. Inter-Cty. Sec. Corp.*, 173 F.3d 1372, 1374 (11th Cir. 1999) (noting this

circuit's "liberal view of what a constitutes a motion for judgment as a matter of

law" and holding that a party's Rule 50(b) motion could be considered, even

though the latter had not even made a Rule 50(a) motion, because counsel had

made a statement at trial expressing his belief that the court should grant judgment

on the ground underlying the subsequent Rule 50(b) motion).

In determining whether a ground identified in a Rule 50(b) motion has been

preserved via an earlier Rule 50(a) motion that failed to specifically identify or

expound on the particular ground, we have held that "[s]trict identity of issues . . .

is not required . . . ." So long as the issues identified in the earlier and later JMOL

motions "are 'closely related,' such that opposing counsel and the trial court may

be deemed to have notice of the deficiencies asserted by the moving party, the

purposes of the rule will be satisfied." *Howard v. Walgreen Co.*, 605 F.3d 1239,

1243 (11th Cir. 2010) (quoting *Sharon Steel*, 781 F.2d at 1549). If, however, "the

47

new and old grounds vary greatly," the new ground will not provide a basis for granting a JMOL. *Id.; accord Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1289 (11th Cir. 1998).

Applying the above principles to the present case, I agree with the district court that Homeward's motion for JMOL, based on the absence of evidence showing a specific intent to harm, did not cause McGinnis unfair surprise. Along those same lines, I further agree that Homeward's arguments during the consolidated charge conference and Rule 50(a) colloquy were closely enough related to the ground it later articulated in support of its post-verdict motion to cap punitive damages.

As our caselaw explains, the purpose behind Rule 50's requirement that a pre-verdict motion be made before a litigant can later seek a post-verdict judgment is to ensure that the opposing party is not lulled into a false assurance that he has presented a triable jury question. Allowing a putative movant to lie in wait, poised to ambush his adversary once the latter can do nothing to correct an overlooked omission in the evidence, is contrary to the goal behind Rule 50.

In this case, however, there is no indication that McGinnis had any additional evidence in her arsenal to prove what she knew was the only factual

48

question for the jury to decide in this second phase of the trial[2]:  whether Homeward had acted with specific intent to harm.  Indeed, even though Homeward's counsel emphasized in his closing argument that McGinnis had failed to offer any evidence of a specific intent to harm, the response of McGinnis's attorney in his own subsequent closing argument was comparatively cursory and not entirely responsive.  There is no reason to believe that there was some other piece of evidence that McGinnis had available to introduce if, in the jury charge/motion colloquy, Homeward had explicitly articulated its position that any punitive damages would be subject to a cap, given the absence of evidence of a specific intent to harm.

As to whether the grounds for JMOL urged by Homeward in both the pre-verdict colloquy and post-verdict written motion were related closely enough to alert McGinnis to the possibility of a claim of insufficient evidence concerning the specific-intent-to-harm element, it is true that during the colloquy, Homeward mostly discussed McGinnis's purported failure to prove that Homeward had been unreasonable in calculating escrow payment amounts and in ultimately foreclosing on her property after McGinnis continued to refuse to pay the amounts Homeward

---

[2]  In the first phase of the trial, the jury determined liability and also decided whether McGinnis was entitled to punitive damages.  Based on the instructions provided by the court as to that question, the jury decided that she was.  In the second phase of the trial, the jury was directed to determine the actual amount of punitive damages and was told that it had to first find that Homeward acted with a specific intent to harm McGinnis before it could set damages any higher than $250,000.

49

said it was owed.  Thus, much of the colloquy focused directly on the wrongful foreclosure claim.  But the remaining claims were largely derivative of that claim.  In fact, Homeward's counsel asked for judgment on the intentional infliction of emotional distress claim, whose elements were closely related to the question whether Homeward acted with the intent to harm McGinnis.  Finally, at the end of the colloquy, Homeward's counsel asked for JMOL "as to all claims."

Yet, even assuming that the above remarks were too subtle or imprecise for purposes of preserving the argument at issue here, Homeward's counsel at one point in the colloquy actually pointed out the absence of evidence of specific intent, stating:  "And just to be honest[,] there isn't any evidence of specific intent in this case."  Granted counsel was not speaking about punitive damages, but was instead observing that McGinnis was trying to turn a wrongful foreclosure claim into an intentional tort warranting emotional distress damages.  Nevertheless, counsel did make clear his position that evidence of specific intent was lacking in the case.  Given that the only claim in the case calling for proof of "specific intent" was the claim for punitive damages exceeding $250,000, McGinnis should have immediately recognized that the evidentiary basis for that claim was likewise in play.

There is no bright-line rule in deciding a question such as the one before us in this case.  Instead, one must make a judgment call.  Applying the liberal,

50

flexible, and pragmatic standard that our Court uses to determine whether a Rule 50(a) motion has adequately preserved an issue for Rule 50(b) purposes, I conclude that McGinnis was necessarily aware that Homeward questioned the evidentiary sufficiency of her claim that Homeward had acted with the specific intent to harm. Further, however imprecise and inartful Homeward's notice of this potential challenge may have been, it could not have mattered because McGinnis had no additional evidence to offer on this point. For these reasons, like the district court, I conclude that Homeward's Rule 50(b) motion constituted a renewed JMOL motion, subject to consideration on its merits. I therefore respectfully dissent from the contrary holding of the majority opinion but concur in all other aspects of the opinion.