[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13473

Non-Argument Calendar

_____

JASON HARTMAN,
PLATINUM PROPERTIES INVESTOR NETWORK, INC.,
THE HARTMAN MEDIA COMPANY, LLC,

Plaintiffs-Counter Defendants-Appellees,

*versus*

JOHN DOES 1-2

Defendants,

CHARLES SELLS,
THE PIP-GROUP, LLC,

2                   Opinion of the Court                23-13473

Defendants-Counter Claimants-Appellants,


STEPHANIE PUTICH,
YOUNG CHUNG,
BLINDSPOT DIGITAL, LLC,
ELENA CEBOTARI SELLS,

Defendants-Appellants.


_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:18-cv-61907-JMS

_____

Before JORDAN, ROSENBAUM, and LAGOA, Circuit Judges.

PER CURIAM:

Defendants-Appellants appeal from the district court's denial of their motions for judgment as a matter of law[1] and for a new trial or remittitur of damages. In this action, Plaintiffs-Appellees real-estate professional Jason Hartman and his companies accused

---

[1] Defendants refer to their motion as a motion for acquittal. But this case is a civil one, and they proceeded under Federal Rule of Civil Procedure 50. So we refer to their motion as one for judgment as a matter of law, which Rule 50 covers.

Defendants—a rival real estate investor and his associates—of committing a wide variety of misconduct as part of a smear campaign to harm Plaintiffs' reputation and steal their clients. The allegations asserted federal and state RICO violations, false advertising, invasion of privacy, trademark infringement, and unfair competition. The case proceeded to trial, and the jury returned a verdict for Plaintiffs and awarded substantial damages, including for counts on which the court had already determined liability at summary judgment.

On appeal, Defendants collectively argue that they were entitled to judgment as a matter of law on the RICO counts because the alleged scheme lacked a specific threat of continued criminal activity. In addition, one Defendant separately argues that she was not involved in the alleged scheme and that the record supports neither the verdict nor the damages against her. After careful review, and for the reasons explained in more detail below, we affirm the judgment of the district court.

## I.

We begin with an overview of the alleged scheme to provide necessary context for the arguments on appeal. We describe the facts in the light most favorable to the jury verdict. *See Howard v. Walgreen Co.*, 605 F.3d 1239, 1242 (11th Cir. 2010).

Hartman is a real-estate investment professional and podcaster who formed two companies, Platinum Properties Investor Network Inc. and The Hartman Media Company LLC, to promote real estate investment through his investor network. Hartman

Media owns the valid, registered service marks "Jason Hartman" and "jasonhartman.com."

Charles Sells ("Sells") owned and operated a competing real-estate investment advisory company, the PIP Group, LLC, along with his wife, Elena Sells ("Lena"), PIP's director of operations and 49% owner.

In 2018, Hartman's businesses were on a "steady upward trajectory," earning a spot on *Inc. Magazine*'s list of the 5,000 fasting growing companies. Sells, meanwhile, was trying to combat negative online reviews of PIP, which he blamed in part on Hartman, who previously had invested in and was openly critical of PIP's tax-lien investment business. Sells was convinced that Hartman was behind some negative reviews, though Sells admitted at trial he had no evidence to support those claims. Sells and Hartman were also involved in separate litigation.

In May 2018, Sells began a smear campaign against Hartman, intending to "crush[] this douche" and "put[] him out of business completely." Sells testified that his goal was not only to destroy Hartman's business, but also to destroy him personally and emotionally.

To accomplish these goals, Sells set out to create a "very documented, very exposing website" to disseminate negative information about Hartman and his companies. For the "technical side" of things, he relied on Young Chung, the founder of digital marketing agency Blindspot Digital, whom Sells had hired to improve PIP's own website a few months earlier. With Chung's help,

23-13473              Opinion of the Court                    5

Sells registered multiple online domain names that were confusingly similar to Hartman's name or his companies, so that they would show up on internet searches for Hartman.[2]  Chung then built a website hosted on the domain "jasonhartmanproperties.com," where the other domains Sells bought redirected.  Sells used offshore entities and false contact information to register the domains and host the jasonhartmanproperties.com website.  And he created content for the site with assistance from Stephanie Putich, PIP's sales and marketing coordinator.

After the jasonhartmanproperties.com website went live at the end of May 2018, Sells, Chung, and Putich distributed links to the site, at times using fake names, via internet forums, social media, and emails.  At Sells's direction, Chung and Putich compiled a contact list of anyone with potential connections to Hartman to send email "blasts" with negative information about Hartman and a link to the website.  Many of the emails purported to be from Hartman at the email address jasonhartman@protonmail.com, which was created by Sells using false contact information.  The emails and website contained false and misleading statements of material fact relating to Hartman's businesses, financial history, litigation history, commercial dealings, alleged prurient nature, credibility, and trustworthiness.

---

[2] The internet domains purchased by Sells included (a) jasonhartmanproperties.com; (b) jasonhartmaninvestments.com; (c) jasonhartmanrealestateinvestments.com; (d) jasonhartmanmedia.com; (e) thehartmanmediacompany.com; and (f) thehartmanmedia.com.

When Hartman took action to have the jasonhartman@protonmail.com account and jasonhartmanproperties.com website shut down for infringement, Sells tasked Chung and Putich with transferring the contents of the website to a new domain, www.thebrokeguru.com, and hiding any connections. Once the transfer was complete, Sells sent additional rounds of emails and links to the new "Broke Guru" website, which contained essentially the same false and misleading statements as the original website, as well as links to PIP's own website. The Broke Guru website remained active until August 2019.

During the fiscal year from 2018 to 2019, the gross revenue of Hartman's companies, Hartman Media and Platinum Properties, collectively fell more than 40%. Consistent with that drop off, Hartman testified that due to the smear campaign, he lost speaking gigs at conferences and former clients stopped communicating. In addition, some clients used the scheme's false information as leverage to renegotiate deals, and others simply refused payment. Over the same period, PIP's gross revenue nearly doubled. Sells was aware of the positive effect on PIP's business. For instance, a June 2018 email from Sells to Putich noted that, while the scheme against Hartman was not "a savory project," it was "already helping us tremendously" in marketing.

## II.

In August 2018, Hartman and his companies, Hartman Media and Platinum Properties, filed an action in federal court against John Doe defendants. Plaintiffs later identified and named

Defendants Sells, Chung, Putich, Lena, Blindspot, and PIP in an amended complaint, and ultimately filed a second amended complaint in September 2019.

Plaintiffs brought an array of claims under federal and Florida law for service-mark counterfeiting and infringement, cybersquatting, unfair competition, false advertising, RICO violations and RICO conspiracy, tortious interference, invasion of privacy, and defamation, among other claims. Several counts were dismissed on pretrial motions and by a stipulation by the parties.

At summary judgment, the district court granted summary judgment as to liability on certain claims as follows: Sells, Putich, and PIP were liable for federal service-mark counterfeiting (Counts I & III); Chung and Blindspot were liable for contributory service-mark counterfeiting (Counts II & IV); Sells was liable for federal cybersquatting (Count V); and Sells, Putich, and PIP were liable for federal unfair competition and false designation of origin (Count VI) and common-law unfair competition (Count XIV) through use of Plaintiffs' service marks. The court granted summary judgment to Defendants on the tortious-interference claim (Count XV) and to all Defendants other than Sells on the cybersquatting claim (Count V).

Before trial, the parties entered a stipulation stating that at least one Defendant knowingly failed to retain electronically stored data. And they agreed to an adverse-inference jury instruction and expert testimony about the contents of the missing data.

The remaining counts and issues, including damages, were tried before a jury over nine days in August and September of 2022. A magistrate judge presided over the trial by consent of the parties. The jury reviewed hundreds of exhibits and heard deposition-designated testimony or live testimony from each of the individual parties (Hartman, Sells, Chung, Putich, and Lena) and other third-party fact and expert witnesses.

Regarding the RICO claims, Plaintiffs argued to the jury that Defendants' "predicate acts" of racketeering activity included wire fraud, knowingly using a counterfeit service mark, and retaliating against Hartman for notifying police of the possible commission of a federal offense. In particular, according to Plaintiffs' theory of the case, Defendants committed mail fraud "[e]very time they sen[t] out an e-mail blast," "disseminat[ed] this out on websites," or lied to service providers to obtain access to services, so there were "hundreds of instances of wire fraud" before the jury.

Ultimately, the jury rendered a verdict for Plaintiffs. As to the claims for which liability remained to be determined, the jury found that each Defendant was liable for false advertising under federal and Florida law (Counts VII & XII); each Defendant was liable for Florida civil conspiracy and invasion of privacy (Counts XIII, XXII & XXIII); Sells, Putich, Chung, and Lena were liable for violating federal and Florida RICO statutes (Counts VIII & X); and Putich, Chung, and Lena were liable for conspiring to violate federal and Florida RICO statutes (Counts IX & XI). The jury awarded substantial actual and punitive damages to Plaintiffs.

The magistrate judge entered final judgment on the verdict in September 2022. As relevant here, the judgment ordered Sells, Putich, Chung, and Lena to pay Hartman's companies $9,000,000 in actual damages for the RICO violations, which was "calculated based on the Jury award of $3,000,000 being trebled pursuant to 18 U.S.C. § 1964(c)." Lena also was ordered to pay $3,000,000 for Hartman's mental anguish with respect to the invasion-of-privacy counts, plus $500,000 in punitive damages, for a total damages award of $12.5 million.

Defendants timely filed a renewed motion for judgment as a matter of law and a motion for a new trial or remittitur. Defendants argued they were entitled to judgment as a matter of law on the RICO claims. As relevant here, they asserted that the evidence established an isolated "scheme directed at one person—Hartman—and his two companies," so there was no threat of repetition extending indefinitely into the future. They also contended that the purported scheme had a clear and "terminable goal," namely the destruction of Hartman's business, and that their attempts at concealment were not sufficient to establish the necessary threat of continuity. As to Lena, Defendants argued that she did not participate in the alleged scheme, contribute to the infringement, or make any false or misleading statement of fact. Finally, Defendants contended that the damages awarded by the jury were speculative and excessive on several grounds.

The trial judge denied the motion for judgment as a matter of law and for a new trial or remittitur in a well-reasoned 59-page

order.  In the trial judge's view, a reasonable jury could infer from the evidence that "Defendants' goal of destroying Hartman's current and future business prospects was an indefinite goal," and so presented a threat of continued racketeering activity.  The trial judge also found that that the evidence supported the jury's verdict as to Lena.  The trial judge otherwise found insufficient grounds on which to grant a new trial or remittitur.  Defendants now appeal.

## III.

We review de novo the denial of a motion for judgment as a matter of law, viewing the evidence and drawing all reasonable inferences in favor of the non-moving party.  *Howard*, 605 F.3d at 1242; *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004).  "The motion should be granted only when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action."  *Howard*, 605 F.3d at 1242 (quotation marks omitted).

In considering whether a verdict is supported by sufficient evidence, we "must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party."  *McGinnis v. Am. Home Mortg. Serv., Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016).  "It is the jury's task—not the court's—to weigh conflicting evidence and inferences, and determine the credibility of witnesses."  *Id.* (cleaned up); *see Redding v. Coloplast Corp.*, 104 F.4th 1302, 1313 (11th Cir. 2024).  And in this Circuit, "a factfinder can use a witness's noncredible testimony as corroborating

substantive evidence against the witness's interests, regardless of whether the case arises in the civil or criminal context." *Silva v. Dos Santos*, 68 F.4th 1247, 1257 (11th Cir. 2023).

We review the denial of a motion for new trial for an abuse of discretion. *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006). And "our review of a trial court's decision whether to remit a jury's award of compensatory damages is highly deferential." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1315 (11th Cir. 2001).

## IV.

In their collective brief, Sells, Chung, Putich, PIP, and Blindspot argue that Plaintiffs failed to establish a pattern of racketeering activity because the scheme alleged and proved at trial did not pose a threat of indefinite repetition. Lena adopts this argument.

"Essential to any successful RICO claim are the basic requirements of establishing a RICO enterprise and a 'pattern of racketeering activity.'"[3] *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004). A RICO enterprise may include any group of persons that associates "with the purpose of conducting illegal activity." *Id.* (quotation marks omitted).

---

[3] Plaintiffs alleged violations of the federal RICO statute, 18 U.S.C. § 1962(b)–(d), and Florida's RICO analog, the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.103(2)–(4). "Because Florida courts often look to the [f]ederal RICO decisions for guidance in interpreting and applying the act, the analysis we apply to Plaintiffs' federal RICO claims is equally applicable to their state RICO claims." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1263 (11th Cir. 2004).

To establish a "pattern of racketeering activity," the plaintiff must prove that "(1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Id.* In other words, the "pattern" requirement, particularly its continuity element, limits RICO's application to "*ongoing* criminal activity, rather than sporadic, isolated criminal acts." *Id.*

The Supreme Court has explained that "continuity" may be either closed- or open-ended. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). It can refer "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241–42. Thus, a RICO plaintiff may establish "continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242. Or the plaintiff can establish a "threat of continued racketeering activity" extending indefinitely into the future. *Id.* Plaintiffs rely on the open-ended theory of continuity.

A RICO plaintiff may show open-ended continuity with proof "either that the alleged acts were part of the defendants' regular way of doing business, or that the illegal acts threatened repetition in the future." *Jackson*, 372 F.3d at 1267. Whether the evidence "establish[es] a threat of continued racketeering activity depends on the specific facts of each case." *H.J. Inc.*, 492 U.S. at 242. In evaluating the continuity element, we consider not only duration but also the nature and scope of the alleged racketeering

activity. *See Jackson*, 372 F.3d at 1267–68 (concluding that the "narrow scope of the alleged racketeering activity," relating to the settlement of a single lawsuit, did not support the "threat of continued criminal activity in the future"). In contrast to closed-ended continuity, "continuity may be established under the open-ended theory though the number of related predicates involved may be small and they may occur close together in time." *United States v. Browne*, 505 F.3d 1229, 1260 (11th Cir. 2007) (cleaned up).

Here, Defendants have not shown that the district court erred in denying their motion for judgment as a matter of law. Defendants claim that open-ended continuity was absent because, in their view, the scheme involved essentially one victim—Hartman, plus his closely held companies—and "had a built-in ending point, destroying Plaintiffs' business."

But after careful review, we agree with the trial court that a reasonable jury could find that Defendants' conduct presented a threat of continued racketeering activity extending indefinitely into the future.[4] *See H.J. Inc.*, 492 U.S. at 242. The facts suggested that Sells had a personal animus against Hartman that would extend beyond his current businesses, Hartman Media and Platinum Properties. Indeed, Sells testified that he wanted not only to destroy Hartman's business, but to "crush" him "emotionally" and "personally." Emails also show that Sells knew that the smear campaign was bringing business to PIP and "helping us tremendously."

---

[4] No showing has been made that the alleged acts were part of Defendants' "regular way of doing business." *Jackson*, 372 F.3d at 1264.

Thus, a jury could reasonably conclude that the scheme had multiple, overlapping goals with no logical or clear end point. So in our view, the alleged scheme here is distinguishable from those having a "clear and terminable goal," which "cannot support a finding of any specific threat of continuity that would constitute open-ended continuity."[5] *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 782 (7th Cir. 1994).

---

[5] *Cf., e.g., First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 180–81 (2d Cir. 2004) (concluding that a scheme to fraudulently convey the debtor's assets was "inherently terminable" because it was essentially complete when the debtor filed for bankruptcy); *GE Inv. Private Placement Partners v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) ("Where the fraudulent conduct is part of the sale of a single enterprise, the fraud has a built-in ending point, and the case does not present the necessary threat of long-term, continued criminal activity."); *Efron v. Embassy Suites*, 223 F.3d 12, 19–21 (1st Cir. 2000) (concluding that a scheme to squeeze appellant and two co-partners out of a business partnership early in its existence so that the remaining partners could reap greater profits had a limited life expectancy "almost by definition" and, consequently, could not satisfy the element of open-ended continuity); *Thompson v. Paasche*, 950 F.2d 306, 311 (6th Cir. 1991) (concluding that a fraudulent scheme to sell nineteen plots of land was "an inherently short-term affair" that was, "by its very nature, insufficiently protracted to qualify as a RICO violation"); *Lange v. Hocker*, 940 F.2d 359, 362 (8th Cir. 1991) (holding that the allegedly illegal takeover of a controlling interest in a corporation and the attempt to ratify it was complete and posed no ongoing threat of racketeering activity); *Banks v. Wolk*, 918 F.2d 418, 423 (3d Cir. 1990) (holding that a single episode of real estate fraud could not establish open-ended continuity without a factor indicating that the actions of the defendants would threaten future harm to others); *Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1273–74 (10th Cir. 1989)

While the scheme was relatively short-lived as far as RICO is concerned, Defendants correctly concede that "the lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity," such as by legal action. *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991). And the evidence reflects that Defendants took steps to cease their misconduct only once Hartman took legal recourse. What's more, despite Hartman's efforts to shut them down, Defendants transferred the contents of the jasonhartmanproperties.com website to a new domain, concealing their identities in the process, so they could continue the internet-and-email campaign against Hartman. In other words, the acts of concealment went beyond "attempts to conceal an initial fraudulent act," which are "not sufficient to establish open-ended continuity," but instead were aimed in part at perpetuating the scheme. *Jackson*, 372 F.3d at 1268.

Plus, the jury had ample opportunity to judge Defendants' credibility in assessing the likelihood of continuing criminal activity. *See Redding*, 104 F.4th at 1313. At trial, Sells expressed an intent to continue the internet-and-email campaign "[i]f Hartman continues to harass[] me, absolutely," despite testifying he would "never do this again." Defendants refer to this comment as a "conditional threat," apparently dependent on Hartman's continued

---

("[T]here is no open-ended ongoing pattern of racketeering activity alleged here. At most, plaintiff has alleged a scheme to accomplish one discrete goal, which he alleges was accomplished.") (cleaned up).

"harass[ment]."  But the jury was free to disbelieve Sells's testimony that there was anything conditional about his threat of continuing activity.  In fact, the jury heard evidence that Sells was paranoid about Hartman and that he believed without evidence that Hartman had orchestrated negative online reviews of PIP.

Finally, Defendants emphasize that this was a "single scheme with no future threat to others."  But a RICO plaintiff is not required to prove "multiple criminal schemes," even if such evidence would be "highly relevant" to the question of continuity. *H.J.*, 492 U.S. at 240 ("[I]t is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes.").  Likewise, even assuming the case involves a single victim, Hartman, "the existence of a single victim does not preclude the existence of a pattern of racketeering activity."  *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516, 523 (7th Cir. 1995).  And for the reasons we've explained above, a jury could reasonably conclude that the alleged scheme did not have a natural or clear end point, despite having a narrow target.

For these reasons, we affirm the district court's denial of Defendants' motion for judgment as a matter of law.  Beyond the issue of continuity, Defendants have not developed any argument specific to the predicate acts, such as mail fraud, or to the other elements of the RICO claims.  We express and imply no opinion as to whether the evidence was otherwise sufficient to satisfy those elements.

**V.**

23-13473                 Opinion of the Court                 17

We now turn to Lena's separate arguments.  Lena contends that she was entitled to a judgment as a matter of law on several counts for lack of sufficient evidence of her participation.  She also argues that a new trial is warranted because the verdict was against the great weight of the evidence, and because the damages imposed against her were so excessive as to shock the conscience.  The other Defendants adopt Lean's argument on excessive damages.

*A. Motion for Judgment of as a Matter of Law – RICO Claims*

The jury found that Lena was liable for violating, and conspiring to violate, the federal and Florida RICO statutes, and the district court found sufficient evidence to sustain the verdict.  On appeal, Lena maintains that Plaintiffs failed to prove she was a willing participant in the RICO enterprise or conspiracy.[6]

---

[6] The remainder of Lena's argument in this section is not adequately developed for appeal.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").  For instance, she asserts in passing that "there is no evidence of predicate acts of racketeering of any sort or that the requirements for RICO were otherwise satisfied, . . . or that she had the requisite criminal intent as to any of the predicate offenses, e.g. wire fraud."  But she does not further explain or develop those glancing assertions or her knowledge of wrongdoing in her initial brief, and instead focuses on the lack of evidence of actual participation.  That is not adequate to properly raise the other issues for appeal.  While she develops relevant arguments on these points in her reply brief, they come too late.  *See id.* ("Arguments raised for the first time in a reply brief are not properly before a reviewing court.") (quoting another source).

To prove a RICO conspiracy, the plaintiff must show "an agreement to violate a substantive RICO provision"—that is, an agreement "to participate directly or indirectly in the affairs of an enterprise through a pattern of racketeering activity." *United States v. Castro*, 89 F.3d 1443, 1450–51 (11th Cir. 1996). The existence of a such an "agreement" can be established by showing either (1) "an agreement on an overall objective" or (2) "that the defendant agreed personally to commit two or more predicate acts." *Id.* at 1451. The existence of the conspiracy agreement can be inferred from the "conduct of the alleged participants or from circumstantial evidence of the scheme." *United States v. Church*, 955 F.2d 688, 695 (11th Cir. 1992). Moreover, "a defendant can be convicted of conspiracy if the evidence demonstrates that he was aware of the conspiracy's essential nature, even if he did not know all of its details, played only a minor role in the overall scheme, did not have direct contact with other alleged co-conspirators, or did not participate in every stage of the conspiracy." *United States v. Sosa*, 777 F.3d 1279, 1290 (11th Cir. 2015).

Here, the trial record supports reasonable inferences that Lena knew of and agreed to the overall objective of the scheme against Hartman. For instance, Lena's deposition-designated testimony at trial was laced with invective against Hartman that echoed Sells's and the scheme's assertions. And documentary evidence showed that she was forwarded or copied on some emails related

to aspects of the scheme.[7]  Other emails suggest that she was well aware of the money and time Sells was spending on the Hartman project, and that she went "ballistic" when the jasonhartmanproperties.com website was shut down in August 2018.  Although Lena denied reading the emails and claimed limited knowledge of the project, a jury could disbelieve her testimony and instead conclude that she knew of the scheme against Hartman.  *See Silva*, 68 F.4th at 1257.

Still, evidence of Lena's actual participation is not overwhelming.  The record shows that, as PIP's director of operations, Lena paid invoices for the company, including paying Chung (and Blindspot) for some of the services he performed for Sells and PIP.  And in July 2018, Lena listened to one of Hartman's podcasts for Sells, who wanted information about Hartman's responses to "anything we have accused him of."  Although Lena supervised Putich when Putich was first hired, there is no evidence she supervised Putich in relation to the Hartman scheme.  Plaintiffs also assert that Lena agreed to obtain contact information for the scheme, but they mistakenly cite Putich's testimony about Putich's own conduct.

But when we view this evidence in the light most favorable to the verdict, we can't say that the record is insufficient to support

---

[7] According to the trial court, these emails discussed the Broke Guru and "the Truth about Jason Hartman," moving contacts from the original website to the new website, the results of Chung's efforts to gain the original website more internet traffic through search-engine optimization, Hartman's email contacts, and how PIP would respond to a Better Business Bureau complaint (which Sells believed that Hartman was behind).

the jury's finding that Lena willfully participated in the scheme. While not abundant, the evidence supports a conclusion that Lena provided some assistance to the scheme—paying Chung for work on the websites and reviewing Hartman's podcasts for Sells. That Lena may have played "only a minor role in the overall scheme" does not preclude her liability for conspiracy. *See Sosa*, 777 F.3d at 1290. The jury was also instructed that Defendants knowingly failed to preserve certain electronic data, and that the jury could presume that any missing information or data that it found existed was unfavorable to Defendants. And the jury had the opportunity to weigh and reject Lena's testimony about her knowledge of and involvement in the scheme, in conjunction with testimony from the other defendants. *See Silva*, 68 F.4th at 1257. Based on all these factors, we agree with the trial court that sufficient evidence supported the jury's finding that Lena knowingly participated in the alleged RICO scheme.

B. *Motion for Judgment as a Matter of Law – Remaining Counts*

We assume without deciding that the district court erred in declining to grant a judgment as a matter of law on the claims for substantive RICO violations, contributory trademark infringement, ad false advertising. But because Lena has not shown that a judgment as a matter of law was warranted on the RICO conspiracy counts, we conclude that any error in failing to grant a judgment as a matter of law on those substantive charges was harmless.

True, the jury awarded separate damages figures for these counts. But the jury also awarded $3 million in damages based on

the federal RICO conspiracy alone.  And the district court's result-ing judgment—to avoid duplicative damages—did not order any damages pursuant to the verdict on the trademark infringement and false-advertising counts.  Rather, it imposed only a single award of $3 million in business damages for all the RICO counts, which it then "trebled pursuant to 18 U.S.C. §1964(c) (or alterna-tively, Fla. Stat. §772.104)," for a total of $9 million.  The only other damages imposed against Lena were for invasion of privacy ($3 million in actual damages and $500,000 in punitive damages).

Under § 1964(c), a person who establishes that he was "in-jured in his business or property by reason of a violation of section 1962 of this chapter . . . shall recover threefold the damages he sus-tains."  18 U.S.C. § 1964(c); *see* Fla. Stat. § 772.104(1).  Conspiring to violate the substantive RICO provisions is itself a violation of § 1962.  *See* 18 U.S.C. 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.").  Because the $9 million award is independently supported by the verdict on the RICO conspiracy counts, it follows that reversing the court's denial of the motion for judgment as a matter of law on the other counts would have no effect on the final judgment.  *Cf. Bauman v. Centex Corp.*, 611 F.2d 1115, 1119 (5th Cir. 1980) ("Since the jury's award of actual and exemplary damages can be upheld by the Texas law fraud claim we need not reach defend-ant's contentions regarding the breach of escrow contract and fed-eral securities law claims.").  So Lena has not shown that the district court reversibly erred in denying her motion for judgment as a matter of law.

*C. Motion for New Trial – Weight of the Evidence*

Next, Lena argues that the district court erred in not granting a new trial. "A trial judge may grant a motion for a new trial if he believes the verdict rendered by the jury to be contrary to the great weight of the evidence." *Watts v. Great Atl. & Pac. Tea Co., Inc.*, 842 F.2d 307, 310 (11th Cir. 1988). The deferential abuse-of-discretion standard "is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed." *Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1498 (11th Cir. 1987).

Here, Lena has not shown that the district court abused its discretion by failing to order a new trial. Lena challenges the verdict on the RICO counts and the Florida civil conspiracy count on the ground that the great weight of the evidence showed her "awareness" but not her "actual participation." Although the evidence of Lena's participation in the alleged unlawful conduct was not overwhelming, we can't say that the jury's verdict was against the great weight of the evidence, for essentially the same reasons we've already discussed.

As for the other counts Lena references, they fail to show that a new trial was warranted. With regard to the invasion-of-privacy counts (Counts XXII & XXIII), Lena did not raise any argument about her liability for these claims in her motion for new trial, and we will not consider the issue for the first time on appeal. *See Reider v. Philip Morris USA, Inc.*, 793 F.3d 1254, 1258 (11th Cir. 2015) ("[I]ssues raised for the first time on appeal are generally forfeited because the district court did not have the opportunity to consider

23-13473                Opinion of the Court                23

them.") (quotation marks omitted); *Electro Servs., Inc. v. Exide Corp.*, 847 F.2d 1524, 1530 (11th Cir. 1988) ("[T]here can be no appellate review if the trial court was not given an opportunity to exercise its discretion on a motion for a new trial.").[8] As for the unfair-competition claims (Counts IV & XIV), the jury did not find Lena liable or impose any damages against her. And even assuming insufficient evidence to support the verdict on the contributory-infringement and false-advertising claims (Counts II, IV, VII, & XII), such a conclusion would not broadly undermine the integrity of the verdict. That Lena did not meaningfully facilitate the trademark infringement, or personally make any false or misleading statements, does not preclude her participation in the alleged RICO scheme, for the reasons we've already explained.

E. *Motion for New Trial – Damages*

Finally, Lena contends that the damages award against her was so excessive as to shock the conscience. The other Appellants adopt this argument.

In general, "a grossly excessive award may warrant a finding that the jury's verdict was swayed by passion and prejudice and thus necessitate a new trial." *Goldstein v. Manhattan Indus., Inc.*, 758

---

[8] In exceptional circumstances, we may review a forfeited issue for plain error in a civil case. *Ledford v. Peeples*, 657 F.3d 1222, 1258 (11th Cir. 2011); *see United States v. Gallardo*, 977 F.3d 1126, 1142 n.12 (11th Cir. 2020) (in a criminal case, "when the defendant fails to present to the district court a particular ground for a new trial in his motion, any claim of error on appeal regarding that new ground is reviewed only for plain error"). But this is not a case that warrants deviation from our normal practice.

F.2d 1435, 1447 (11th Cir. 1985).  But "a new trial should be ordered only where the verdict is so excessive as to shock the conscience of the court."  *Id.*  We will not overturn the court's refusal to grant a new trial "unless there has been a clear abuse of discretion."  *Id.* at 1447–48.

Here, Lena has not shown that the trial court abused its discretion by denying a new trial or remittitur based on an excessive damages award.  In its denial order, the trial court reviewed in detail the evidence supporting the damages award, which included (a) expert testimony that Plaintiffs suffered a loss of $3,815,620 in economic damages from Defendants' conduct; (b) expert testimony that a corrective advertising campaign would cost approximately $1.6 to $1.8 million dollars; (c) Hartman's testimony that he lost business and networking opportunities; and (d) testimony from two business associates who ceased or paused their business relationships with Hartman because of the scheme.  Based on this evidence, the trial court reasoned that the jury reasonably could have found, as the verdict reflected, that Defendants caused several million dollars in damages to Plaintiffs' business.[9]  Lena fails to engage in any detail with this evidence or the court's reasoning, so she has not established a clear abuse of the court's discretion in its conclusion that the amounts awarded were supported by the

_____

[9] As we have noted, the jury awarded $3 million in damages for the RICO counts, which was increased threefold under RICO's treble damages provision.  *See* 18 U.S.C. § 1964(c).

evidence and did not warrant a new trial or remittitur. *See Goldstein*, 758 F.2d at 1447–47.

Apart from her challenge to the damages evidence as a trial, Lena also asserts more broadly that the jury's findings reflect an "impermissible and runaway verdict that visited maximum damages on all of the defendants as a collective," driven by Plaintiffs' attempts to lump Defendants together and to invite "overlapping recovery" and duplicative damages, by the court's prior rulings at summary judgment, and by other aspects of the trial. But the only part of this argument for a new trial that was presented to the trial court concerned duplicative damages, and Lena fails to address the court's ruling that she invited any error in that regard by failing to authorize a jury instruction on the duplicative-damages issue. Nor does she assert that the court in fact awarded duplicative damages in its judgment.

The remaining arguments were not raised in support of a new trial before the district court, whether at trial or in the motion for new trial, and Lena cites no supporting legal authority arising from comparable circumstances. Because the district court never had a chance to consider this "runaway verdict" argument, which necessarily calls for an expansive and fact-bound inquiry, we will not consider it for the first time on appeal. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004) (describing circumstances under which it is appropriate to consider an argument first raised on appeal).

**VI.**

26                         Opinion of the Court                    23-13473

In sum, we affirm the judgment of the district court.

**AFFIRMED.**